1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MICHAEL J. BRODHEIM,

11              Petitioner,                    No. CIV S-06-2326 LKK GGH P

12        vs.

13   KATHLEEN DICKINSON, et al.,          ORDER &

14              Respondents.[1]           FINDINGS AND RECOMMENDATIONS

15   _____/

16   I. Introduction/Background

17              By order, filed on July 26, 2010, following the en banc decision in Hayward v.

18   Marshall, 603 F.3d 546 (9th Cir. 2010), the stay in this matter imposed, since March 16, 2009, in

19   an order noting the mutual consent of the parties to the stay pending resolution of Hayward, was

20   lifted.  By order, filed on July 30, 2010, this court ordered concurrent supplemental briefing

21   regarding the effect of the decision in Hayward, supra, upon this case, which briefing has been

22   filed.  In addition, petitioner had earlier filed a notice of supplemental authority on April 28,

23   2008, to which respondent filed a reply on May 1, 2008; petitioner filed a corrected notice of

24   supplemental authority on May 2, 2008, to which respondent filed a response on the same day.

25   _____

26        [1] Respondent points out that Warden Dickinson is now the proper respondent.  Docket #
     49, fn. 1.

                                            1

Petitioner, a state prisoner having initially proceeded pro se, has subsequently been proceeding with appointed counsel, on his amended petition,[2] pursuant to 28 U.S.C. § 2254, challenging the October, 2003 decision of the California Board of Parole Hearings (BPH),[3] at his third parole suitability hearing, which became final in January of 2004,[4] finding him unsuitable for parole.[5]  Docket # 4-6, pp. 34-115.  Petitioner was convicted in Alameda County Superior

[2] This case was transferred to this Eastern District court from the Northern District on October 23, 2006.

[3] As of July 1, 2005, the California Board of Prison Terms was abolished, creating the Board of Parole Hearings in its place.  Cal. Penal Code § 5075(a).  Although at the time of the parole denial at issue, the agency was named the Board of Prison Terms, the court will refer to it by the more recent and currently existing name, the Board of Parole Hearings, using the acronym "BPH."

[4] The court takes judicial notice that petitioner has a habeas petition challenging a subsequent 2007 parole denial that is in the process of being briefed in Brodheim v. Dickenson, CIV-S-10-0272 GEB CMK P.  (Judicial notice may be taken of court records.  Valerio v. Boise Cascade Corp., 80 F.R.D. 626, 635 n.1 (N.D. Cal. 1978), aff'd, 645 F.2d 699 (9th Cir.), cert. denied, 454 U.S. 1126 (1981)).  To the extent it might be argued that a subsequent parole denial might render this petition moot, such an argument is deemed to be without merit since petitioner is still in custody as a result of the 2003 decision he challenges herein and his claim challenging denial of parole falls within the "capable of repetition yet evading review" exception to mootness.  See Hubbart v. Knapp, 379 F.3d 773, 777 (9th Cir. 2004) (finding a habeas petition challenging a two-year commitment under California's Sexually Violent Predator Act "evaded review" because the duration of the commitment was too short to be fully litigated prior to its expiration and there was a reasonable expectation that petitioner would be subject again to the same action).

[5] This case is related to a 42 U.S.C. § 1983 civil rights action, Brodheim v. Welch, et al., CIV-S-05-1512 LKK GGH P, claiming, under 42 U.S.C. § 1983, implementation against him of an unwritten and unconstitutional parole policy of systematically denying parole to state prisoners convicted of first degree murder and serving life sentences.  Petitioner appears to fit the parameters of being a class member in the pending class action, Gilman v. Fisher, CIV-S-05-0830 LKK GGH P, proceeding on behalf of prisoners convicted of murder and serving a sentence of life with the possibility of parole with at least one parole denial, challenging the state procedures denying class members parole as well as the deferred reconsideration following a denial.  Thus, it would appear Case No. CIV-S-05-1512, wherein petitioner as plaintiff seeks declaratory and prospective injunctive relief with regard to the challenged BPH parole procedures/policy, is essentially subsumed within the Gilman class action as a plaintiff who is a member of a class action for equitable relief from prison conditions may not maintain a separate, individual suit for equitable relief involving the same subject matter of the class action.  See Crawford v. Bell, 599 F.2d 890, 892-93 (9th Cir.1979); see also McNeil v. Guthrie, 945 F.2d 1163,1165 (10th Cir. 1991) ("Individual suits for injunctive and equitable relief from alleged unconstitutional prison conditions cannot be brought where there is an existing class action ."); Gillespie v. Crawford, 858 F.2d 1101, 1103 (5th Cir.1988) (en banc) ("To allow individual suits

Court of first degree murder by a jury, on March 18, 1982, and sentenced, on May 3, 1982, to a term of 25 years to life.  Docket # 1, Amended Petition (AP), p. 15, citing Exhibit (Ex.) BB [Doc. # 4-3, p. 10], Abstract of judgment;[6] Answer, Ex. 1. The jury found that petitioner did not personally inflict great bodily injury upon the murder victim.  Id.

At his initial parole consideration hearing on October 26, 1995, petitioner was denied parole for three years.  AP, p. 20, Exs. MM (petitioner's copy of 1995 parole hearing transcript) & MM-1, Doc. # 4-5.  Petitioner points out that he agreed to talk and respond to questions and avers that he answered each question of the panel.  AP, p. 20,  Ex. MM, Doc. # 4-5, p. 15.  Respondent observes that denial was based primarily on the commitment offense, but also on petitioner's dysfunctional family atmosphere and prior social problems with women friends, BPH also noting that petitioner's psychological reports were not all wholly supportive of release as his obsessive compulsive traits did not indicate he would not behave differently if released.  Answer, p. 2, Ex. # 3, Doc. # 29-2 & #29-3 (1995 parole hearing transcript), pp. 28-29.  The panel did also commend petitioner for excellent programming, remaining disciplinary-free, participating in therapy and self-help programs and for having completed his Master's degree in 1991.  See Doc. # 29-3, pp. 27-28.   BPH determined petitioner's minimum eligible parole date to be February 16, 1994.  AP, p. 20, Ex. MM-2, Doc. # 4-5.

At the second (or first subsequent) parole consideration hearing on September 15, 1998, petitioner again answered all panel questions.  AP, p. 22; Answer, Ex. 4, Doc. # 29-4, p. 9 & # 29-5 (1998 parole hearing transcript).  Petitioner was denied parole for four years.  Answer, p. 2, Ex. 4,  Doc # 29-5.  Respondent notes that the denial was based principally on the commitment offense, but also on petitioner's unstable social history (again), and on the fact that he stalked a former girlfriend who had broken up with him, on a recent unfavorable

would interfere with the orderly administration of the class action and risk inconsistent adjudications.").

[6] The court's electronic pagination is referenced.

psychological report and a serious disciplinary action (disrespectful of staff).  Id., at 28-31.

Petitioner notes that the correctional counselor's life evaluation report for this hearing indicated

that with the exception of the single rules violation report, petitioner had been disciplinary-free

and programmed exceptionally well.  AP, p. 20-21, Ex. NN, Doc. # 4-5, p. 82.

The third (or second subsequent) parole consideration hearing was initially held

on September 16, 2002, wherein the panel recommended a three-year parole denial, but due to

apparently malfunctioning recording equipment, "a significant portion of the hearing" could not

be transcribed and that hearing decision was disapproved.  AP, p. 25, Ex. II-A; Answer, p. 2, Ex.

5, Doc. # 29-6 (2002 parole hearing transcript), Ex. 6, Doc. # 29-7 (2002 decision disapproved).

At the re-held third parole (or second subsequent) parole consideration hearing on

October 28, 2003, the one at issue herein, petitioner chose not to discuss the circumstances of his

offense.  AP, p. 27, Ex. UU (petitioner's copy of the 2003 parole hearing transcript), Doc. # 4-6,

p. 26 (although he was sworn in and made some comments at certain points).  Petitioner notes

that the 2003 BPH panel stated that the  "paramount reasoning" in denying him parole for three

more years was the "timing and gravity of the committing offense" with other information

bearing on the decision being that petitioner's correctional counselor Belancik had written

petitioner would pose an "unpredictable degree of risk" to the public if released.  Doc. # 4-6, pp.

107, 109.  Respondent concedes that the gravity of the offense was the primary basis for the

finding of unsuitability, but contends the panel also relied on a history of unstable relationships,

the prior stalking incident, petitioner's alleged experimentation with drugs, numerous letters in

opposition to parole and opposition of the victim's family and the district attorney's office,

determining that petitioner needed to continue to maintain positive gains.  Answer, pp., 3-4,

citing Ex. 8 (2003 parole hearing transcript).

Petitioner raises the following claims alleging violation of his federal due process

rights: 1) by parole authority's arbitrary and continued reliance on unchanging factors; 2) by

parole authority's decade-long policy of rejecting parole application of every male prisoner

serving a sentence of 25 years to life for first degree murder; 3) by parole authority's policy of systematically characterizing first degree murder as sufficiently exceptional to warrant denial of parole; 4) because parole authority's decision to deny parole was based on findings (a) not supported by the requisite evidence and/or (b) otherwise arbitrary and/or (c) discriminatory under the Americans with Disabilities Act; 5) by the parole authority's failure to give his parole application constitutionally adequate individualized consideration; 6) because the parole authority was not sufficiently neutral and detached, but rather systematically biased in its decision-making.  Claim 7 is that petitioner's federal equal protection rights were violated. Amended Petition (AP), pp. 12, 36.

## II.  AEDPA

The Anti-Terrorism and Effective Death Penalty Act (AEDPA) "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions.  While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at 1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

"Clearly established" law is law that has been "squarely addressed" by the United States Supreme Court.  Wright v. Van Patten, 552 U.S. 120, 125, 128 S.Ct. 743, 746 (2008).  Thus, extrapolations of settled law to unique situations will not qualify as clearly established.  See e.g., Carey v. Musladin, 549 U.S. 70, 76, 127 S.Ct. 649, 653-54 (2006) (established law not permitting state sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly established law when spectators' conduct is the alleged cause of bias injection).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

1    However, where the state courts have not addressed the constitutional issue in

2    dispute in any reasoned opinion, the federal court will independently review the record in

3    adjudication of that issue.  "Independent review of the record is not de novo review of the

4    constitutional issue, but rather, the only method by which we can determine whether a silent state

5    court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

6    2003).

7    Petitioner presents arguments against the applicability of the above deferential

8    standards of AEDPA in the context of a parole denial challenge on the ground that his challenge

9    is to the decision of an administrative body rather than the judgment of a state court.  Traverse,

10   pp. 8-12.  Averring that the Ninth Circuit has not ruled on the issue, petitioner cites McQuillion

11   v. Duncan, 306 F.3d 895, 901 (9th Cir. 2002), wherein he notes[7] that the question of whether the

12   AEDPA standard of review applied to a prisoner's challenge to a BPH rescission of a parole date

13   was not resolved:

14           McQuillion is a "person in custody pursuant to the judgment of a
             State court," but he is not challenging anything that happened
15           during the trial that led to his conviction and sentence.
             Nonetheless, it is possible that, because his claim of a due process
16           violation by the state parole authority was heard by state courts on
             collateral review, that claim has been "adjudicated on the merits in
17           [a] State court proceeding" within the meaning of AEDPA.

18   McQuillion, supra, 306 F.3d at 901.  The undersigned observes that while therein the issue

19   remained unresolved, the panel assumed, without deciding, the deferential AEDPA standards did

20   apply.  Id.  In further support of his argument, petitioner cites an out-of-circuit case, Cox v.

21   McBride, 279 F.3d 492 (7th Circuit 2002), which held that the 28 U.S.C. § 2244(d), the AEDPA

22   statute of limitations, is not applicable to a federal habeas petition challenging a prison

23   disciplinary determination.  Traverse, p. 32.  However, petitioner also notes the contrary position

24   \\\\\

25

26           [7] Traverse, p. 8, fn. 3.

7

1   held by this circuit, <u>Shelby v. Bartlett</u>, 391 F.3d 1061, 1062 (9[8th] Cir. 2004),[8] wherein the Ninth

2   Circuit expressly joined the Second, Fourth and Fifth Circuits in holding that the AEDPA one-

3   year statute of limitations "applies to all habeas petitions filed by persons in 'custody pursuant to

4   the judgment of a State court,' 28 U.S.C. § 2244(d)(1), even if the petition challenges a pertinent

5   administrative decision rather than a state court judgment." <u>Shelby</u>, supra, 391 F.3d at 1063.

6         Petitioner nevertheless encourages this court (traverse, pp. 9-10 ) to follow the

7   rationale of <u>Rosas v. Nielsen</u>, 428 F.3d 1229, 1222-1233 (9th Cir. 2005) (per curiam), wherein the

8   Ninth Circuit reasoned, within the context of a habeas challenge to a BPH parole denial, that a

9   certificate of appealability was not necessary because the "target" of the petition was the decision

10  of an administrative body and not a state court judgment.  In <u>Rosas</u>, the circuit court relied on its

11  decision in <u>White v. Lambert</u>, 370 F.3d 1002 (9th Cir. 2004), wherein the language of 28 U.S.C. §

12  2253(c)(1)(A) requiring a petitioner to obtain a certificate of appealability to appeal a final order

13  when "the detention complained of arises out of process issued by a State court....," was

14  construed "to hold that a certificate of appealability 'is not required when a state prisoner

15  challenges an administrative decision regarding the execution of his sentence.'" <u>Rosas</u>, 428 F.3d

16  1231, quoting <u>White</u>, 370 F.3d at 1010.  However, in its recent en banc decision in <u>Hayward</u>, the

17  Ninth Circuit expressly overruled:

18       those portions of <u>White</u> and <u>Rosas</u> which relieve a prisoner from
     obtaining a certificate of appealability from administrative
19       decisions such as denial of parole and prison transfer. A certificate
     of appealability is necessary to confer jurisdiction on this court in
20       an appeal from a district court's denial of habeas relief in a § 2254
     case, regardless of whether the state decision to deny release from
21       confinement is administrative or judicial.  Hayward needs a
     certificate of appealability if we are to maintain jurisdiction over
22       this case.

23  <u>Hayward</u>, <u>supra</u>, 603 F.3d at 554.  Therefore, the authority for petitioner's contention that the

24  deferential AEDPA standard should not apply in this context has been definitively overruled.

25  _____

26      [8] See Traverse, p. 32, fn. 5.

1   See also Cooke v. Solis, 606 F.3d 1206, 1212-1213 (9th Cir. 2010) (federal habeas petitioner

2   must obtain certificate of appealability to invoke federal appellate jurisdiction for petition

3   challenging denial of parole; AEDPA standards apply to review of such a petition filed post-

4   AEDPA).

5                Claims 1, 4 and 5: Parole authority's arbitrary and continued reliance on
             unchanging factors violates due process[9]

6

7                Petitioner contends that in finding him repeatedly unsuitable for parole BPH

8   has relied for a decade on unchanging (or immutable) factors.  AP, p. 48.  He asserts that he has

9   been described as a model prisoner, has been found to have "programmed exceptionally well,"

10  and to have continued to comply with the BPH's requirements.  Id.  Moreover, petitioner avers

11  that California Department of Corrections (and Rehabilitation) (CDCR) psychologist Dr.

12  Raymond Crawford has found petitioner's current adjustment to appear "optimal," concluding

13  that his risk of violence is "very low at this time," and that he unqualifiedly "would not pose a

14  danger to the community."  Id., Ex. RR, Doc. # 4-6, Psychological Evaluation for the Board of

15  Prison Terms, dated July 1, 2002, pp. 19-27.  Petitioner also contends that prior to BPH's

16  decision having become final, that he had already served more time than he could have been

17  assessed for his conviction offense pursuant to CAL. CODE REGS. tit.xv, § 2403 (or § 2282(b)).  Id.

18  Thus, he maintains, BPH's continued reliance on the immutable factors of his offense and

19  conduct prior to imprisonment is "otherwise arbitrary," per Superintendent v. Hill, 472 U.S. 445,

20  457, 105 S. Ct. 2768, 2775 (1985) and violative of petitioner's due process rights.  Id. at 49,

21  citing, inter alia, Sass v. California Board of Prison Terms, 461 F.3d 1123 (9th Cir. 2006).

22                Respondent maintains that the BPH's decision is supported by "some evidence," a

23  standard which is "'minimally stringent,'" with "the relevant question" being "whether there is

24

25         [9] The court finds that claim 4, parole authority's decision to deny parole, was arbitrary or
    based on unsupported findings and claim 5, parole authority's failure to give petitioner's parole
    application constitutionally adequate individualized consideration, are essentially subsumed

26  within claim 1.

1   any evidence in the record that could support" the BPH's conclusion.  Answer, pp. 6, 12, citing

2   Powell v. Gomez, 33 F.3d 39, 40 (9th Cir. 1994), and Hill, supra, 472 U.S. at 455-456, 105 S. Ct.

3   2768.  Respondent also contends that the BPH's reliance on the commitment offense and "other

4   'so-called' unchanging factors" to deny parole for a third time was proper.  Answer, p. 13-14.

5                       "Some Evidence" Standard

6            The Ninth Circuit has set forth the standards which govern review of denial of

7   parole eligibility cases when the issue centers on whether there was "some evidence" that a

8   potential parolee would constitute a present danger to public safety.  Under the traditional

9   analysis prior to Hayward v. Marshall, 603 F.3d 546 (9th Cir. 2010) (en banc), the Ninth Circuit

10  parole eligibility cases determined first that the California parole eligibility statute created a

11  federal liberty interest, and then determined the process due from a federal perspective.  See e.g.,

12  Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir 2003) determining that Cal. Penal Code § 3041's

13  "mandatory" language created the federal interest.  Forsaking the previous analysis, Hayward

14  focused on one facet of the process due under state law – "some evidence" – and held that this

15  facet of due process itself created the authority of the federal courts to adjudicate in habeas

16  jurisdiction, which facet did not even have to be federally derived, i.e., that the federal courts

17  could enforce the state standard in the first instance.  Hayward further demurred from finding that

18  a federal liberty interest in application of the "some evidence" standard was created:

19           [C]ourts in this circuit...need only decide whether the California
             judicial decision approving...the decision rejecting parole was an
20           "unreasonable application" of the *California* "some evidence"
             requirement, or was based on an unreasonable determination of the
21           facts in light of the evidence.

22  Hayward v. Marshall, 603 F.3d at 562-563 (emphasis added).  See also Pearson v. Muntz, 606

23  F.3d 606 (9th Cir. 2010) (per curiam); Cooke v. Solis, supra, 606 F.3d 1206.[10]

24

25      [10] Hayward is, of course, the law in this Circuit and must be followed (despite
        respondent's arguments in supplemental briefing to the contrary (see Doc. # 49, pp. 2-5, 7)).
        However, its decision to forego an analysis on whether a federal liberty interest created by state
26      law creates a *federal* due process right to a "some evidence" standard, because the federal courts

First, the undersigned determines that a record review of a state habeas decision based on "some evidence" as the controlling factor is a question of law subject to AEDPA deference under § 2254(d)(1).  Hayward provided for such a review in its alternative analysis of the standards of review quoted above.  Secondly, and significantly, review of a record to determine if an evidentiary standard has been met, e.g., "some evidence," "sufficient evidence," "substantial evidence," has almost invariably been considered a question of law.  See John Kelly v. C.I.R., 326 U.S. 521, 528 (n.7), 66 S.Ct. 29 (1946); Abrams v. United States, 250 U.S. 616, 619, 40 S.Ct. 17 (1919); United States v. Sotelo-Murillo, 887 F.2d 176, 179 (9th Cir. 1989); Suetter v.United States, 140 F.2d 103 (9th Cir. 1944); In re Lazor, 172 Cal.App.4th 1183, 1192 (2009).

Secondly, because the Ninth Circuit has commanded a review of the state's application of its law in this parole eligibility habeas context, despite its incongruity in other habeas settings, the guiding definitions of what is entailed by "some evidence" must be found in

---

can in any event require adherence to a *state* standard, is "fingernails on the chalkboard" in habeas jurisprudence.  The Supreme Court has constantly admonished that federal courts in habeas corpus jurisdiction do not sit to enforce state law requirements.  Estellev.McGuire, 502 U.S. 62, 67, 72-73, 112 S.Ct. 475 (1991).  Rather, if state law has created a liberty interest under the federal Constitution, the process due on account of that federal interest is determined by federal law.  In other words, the federal liberty interest created by state law does not constitutionalize the entire state process underlying the state law creating the liberty interest–federal law determines the minimum due process standards applicable to the interest.  Moran v. Godinez, 57 F.3d 690, 698 (9th Cir. 1994).  See also Rivera v. Illinois, __U.S.__, 129 S. Ct. 1446, 1454 (2009): "'The Due Process Clause, our decisions instruct, safeguards not the meticulous observance of state procedural prescriptions, but "the fundamental elements of fairness in a criminal trial."' ; see e.g., Greenholtz v. Inmates of Nebraska etc., 442 U.S. 1, 14, 99 S.Ct. 2100 (1979) (determining the federal process due, after finding state law created a liberty interest, under the factors set forth in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893 (1978); Wolff v.McDonnell, 418 U.S. 539, 94 S.Ct. 2963 (1974) (same).  Of course, state provided process may dovetail with federal due process requirements, but state process is not adopted in full simply because it underlies the state created liberty interest.  Thus, while the "some evidence" state standard may mirror the need for a federal counterpart, seemingly, the correct analysis would determine this need from a federal perspective in the first instance utilizing Mathews.  Moreover, the federal liberty interest in parole eligibility is established by Cal. Penal Code § 3041 recognizing a right to parole if the public safety would not be endangered, *cf* Greenholtz, not the subsidiary state standards and procedures involved with the liberty interest such as "some evidence," notice requirements, witness availability, or right to counsel.

1    state law.  With later "clarification," that standard is defined by In re Rosenkrantz, 29 Cal. 4th

2    616, 677, 128 Cal. Rptr. 2d 104 (2002):  "Only a modicum of evidence is required."  It is

3    "[i]rrelevant...that evidence in the record tending to establish suitability for parole far outweighs

4    evidence demonstrating unsuitability for parole."   Because some state (and federal) courts had

5    "misinterpreted" Rosenkrantz to require only that some evidence exist disfavoring parole in any

6    of the eligibility factors to be considered, and that the original commitment offense itself could

7    be the total "some evidence" if the offense exhibited characteristics "more than minimally

8    needed to convict for the offense," In re Lawrence, 44 Cal. 4th 1181, 82 Cal.Rptr. 3d 169 (2008),

9    clarified that the "some evidence" had to be related to the overarching requirement of safety to

10   the community.  Id. at 1191 and 1212.  Moreover, immutable circumstances, such as the nature

11   of the offense, could not qualify as "some evidence" unless there was something else in the

12   record indicating that those circumstances would *presently* be predictive of dangerousness if

13   released.  Id. at 1221.  Finally, a BPH "hunch or intuition" was insufficient to stand as "some

14   evidence."

15           Under California law, prisoners serving indeterminate prison sentences "may

16   serve up to life in prison, but they become eligible for parole consideration after serving

17   minimum terms of confinement."  In re Dannenberg, 34 Cal.4th 1061, 1078, 23 Cal.Rptr.3d 417,

18   104 P.3d 783, (2005).  Generally, one year prior to an inmate's minimum eligible parole release

19   date, BPH will set a parole release date "in a manner that will provide uniform terms for offenses

20   of similar gravity and magnitude *in respect to their threat to the public*...."  In re Lawrence, 44

21   Cal.4th at 1202, 82 Cal.Rptr.3d 169 (citing Cal.Penal Code § 3041(a)) [emphasis in Lawrence]).

22   A release date will not be set, however, if BPH determines "that the gravity of the current

23   convicted offense or offenses, or the timing and gravity of current or past convicted offense or

24   offenses, is such that consideration of the public safety requires a more lengthy period of

25   incarceration...."  Cal. Penal Code § 3041(b).

26           As a matter of state constitutional law, denial of parole to California inmates must

                                                    12

be supported by "some evidence" demonstrating future dangerousness.  Hayward, 603 F.3d at 562 (citing In re Rosencrantz, 29 Cal.4th 616, 128, 128 Cal.Rptr.2d 104 (2002)); see also In re Lawrence, 44 Cal.4th at 1191, 82 Cal.Rptr.3d 169 (recognizing the denial of parole must be supported by "some evidence" that an inmate "poses a current risk to public safety"); In re Shaputis, 44 Cal.4th 1241, 1254, 82 Cal.Rptr.3d 213 (2008) (same).  "California's 'some evidence' requirement is a component of the liberty interest created by the parole system of [the] state," Cooke v. Solis, supra, 606 F.3d at 1213, and compliance with this evidentiary standard is, therefore, mandated by the federal Due Process Clause.  Pearson v. Muntz, supra, 606 F.3d at 611.  Thus, a federal court undertaking review of a "California judicial decision approving the ... decision rejecting parole" must determine whether the state court's decision "was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'"  Hayward, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(2)).

When assessing whether a state parole board's suitability decision was supported by "some evidence," the analysis "is framed by the statutes and regulations governing parole suitability determinations in the relevant state."  Irons v. Carey, 505 F.3d at 846, 851 (9th Cir. 2007).[11]  The court must look to California law to determine what findings are necessary to deem a petitioner unsuitable for parole, and then must review the record to determine whether the state court decision holding that these findings were supported by "some evidence" constituted an unreasonable application of the "some evidence" principle.  Id.

Title 15, Section 2402 of the California Code of Regulations sets forth various factors to be considered by BPH in its parole suitability findings for murderers.  The regulation is designed to guide BPH's assessment regarding whether the inmate poses an "unreasonable risk

---

[11] Irons, supra, along with Biggs, supra, and Sass, supra, were all overruled by Hayward, supra, to the extent these cases recognized a right to release on parole arising from the federal constitution rather than from state law.

of danger to society if released from prison," and thus whether he or she is suitable for parole.  In re Lawrence, 44 Cal.4th at 1202, 82 Cal.Rptr.3d 169.  BPH is directed to consider all relevant, reliable information available, including the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.  15 Cal.Code Regs. § 2402(b).

The regulation also lists several specific circumstances which tend to show suitability or unsuitability for parole.  CAL. CODE REGS. tit.xv, § 2402(c)-(d). The overriding concern is public safety, In re Dannenberg, 34 Cal.4th 1061, 1086, 23 Cal.Rptr.3d 417 (2005), and the focus is on the inmate's current dangerousness.  In re Lawrence, 44 Cal.4th at 1205, 82 Cal.Rptr.3d 169.  Thus, under California law, the standard of review is not whether some evidence supports the reasons cited for denying parole, but whether some evidence indicates that a parolee's release would unreasonably endanger public safety.  In re Shaputis, 44 Cal.4th 1241, 1254, 82 Cal.Rptr.3d 213 (2008).  Therefore, "the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public." In re Lawrence, 44 Cal.4th at 1212, 82 Cal.Rptr.3d 169.  In other words, there must be some rational nexus between the facts relied upon and the ultimate conclusion that the prisoner continues to be a threat to public safety.  Id. at 1227, 82 Cal.Rptr.3d 169.

Cal. Penal Code § 3041(b) provides, in relevant part, that the BPH shall set a parole release date "unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration...." CAL. CODE

Regs. tit.xv, § 2402 sets forth the criteria for determining whether an inmate is suitable for parole.
Section 2402(a) provides that "[r]egardless of the length of time served, a life prisoner shall be
found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an
unreasonable risk of danger to society if released from prison." Cal. Code Regs. tit.xv, § 2402(c)
sets forth the circumstances tending to show unsuitability:

> (1) Commitment Offense.  The prisoner committed the offense in
> an especially heinous, atrocious or cruel manner.  The factors to be
> considered include:
>
> > (A) Multiple victims were attacked, injured or killed
> > in the same or separate incidents.
> >
> > (B) The offense was carried out in a dispassionate
> > and calculated manner, such as an execution-style
> > murder.
> >
> > (C) The victim was abused, defiled or mutilated
> > during or after the offense.
> >
> > (D) The offense was carried out in a manner which
> > demonstrates an exceptionally callous disregard for
> > human suffering.
> >
> > (E) The motive for the crime is inexplicable or very
> > trivial in relation to the offense.
>
> (2) Previous Record of Violence. The prisoner on previous
> occasions inflicted or  attempted to inflict serious injury on a
> victim, particularly if the prisoner demonstrated serious assaultive
> behavior at an early age.
>
> (3) Unstable Social History.  The prisoner has a history of unstable
> or tumultuous relationships with others.
>
> (4) Sadistic Sexual Offenses.  The prisoner has previously sexually
> assaulted another in a manner calculated to inflict unusual pain or
> fear upon the victim.
>
> (5) Psychological Factors.  The prisoner has a lengthy history of
> severe mental problems related to the offense.
>
> (6) Institutional Behavior.  The prisoner has engaged in serious
> misconduct in prison or jail.
>
> Section 2402(d) sets forth the circumstances tending to indicate suitability:

15

(1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to the victims.

(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for the Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome . . .

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

California law will be used to determine the "some evidence" issue.

Discusssion

At the October 28, 2003 hearing, wherein petitioner was represented by counsel (as he had been at his two earlier hearings[12]), the statement of facts from the transcript of the decision at the September 15, 1998 parole suitability hearing at pages seven and eight was incorporated by reference, but not at that point set forth in the record.  Petitioner's Ex. UU, Doc. # pp. 34-116; Answer, Doc. # 29-8, Ex. 8, Oct. 28, 2003 parole hearing transcript, p. 30.[13]

---

[12]   See Answer, Exs. 2 - 5.

[13] "On February 28, 1981, the prisoner went to the residence of his former girlfriend in Berkeley, California.  Although[] she had previously terminated their relationship, she agreed to

16

1          Petitioner's counsel posited "two corrections" to the summary at footnote 13,

2   below.  Answer, Ex. 8, p. 30.  It was counsel's belief that petitioner had "hit the victim over the

3   head once."  Id. "There was no beating, he [petitioner] in fact hit her once with the bottle."  Id.

4   In addition, rather than having set the victim's body on fire with lighter fluid, his parole hearing

5   counsel stated that she thought "the facts in the case are that he set the blanket on fire."  Id.  The

6   presiding commissioner noted that this was petitioner's version, but that he accepted the record

7   as stated.  Id., at 30-31.  Then the presiding commissioner proceeded, apparently based on

8   petitioner's electing not to discuss the case at the 2003 hearing,[14] referencing the September,

9   1994,[15] version of the offense at the initial parole consideration hearing (wherein petitioner did

10  agree to speak, as he also did at the second hearing).[16]  This is the version of the offense

11  expressly set forth in the 2003 hearing transcript (as opposed to only incorporated by reference):

13  see the prisoner because he told her that his mother had died.  Following prisoner's consumption of a bottle of champagne, which he had brought with him, he then beat her over the head with the
14  bottle and proceeded to strangle her to death with his hands.  According to Deputy District Attorney Kenneth Burr, and as admitted by the prisoner in his statement to another Deputy
15  District Attorney, the prisoner then proceeded to complete an act of sexual intercourse with the body.  Following this, he apparently attempted to set the victim's body on fire using lighter fluid,
16  but was unsuccessful.  That evening, following an unsuccessful attempt at suicide, slashed wrists, coupled with a fall or a jump from a freeway overpass, resulting in a skull fracture and broken
17  collar bone, the prisoner was found and hospitalized at Highland Hospital.  On March 2, 1981, the victim's body was discovered and on March 4, 1981, the prisoner was located at the hospital
18  and placed under arrest.  He had left his wallet and identification at the scene of the murder."  Answer, Doc. # 29-4, Ex. 4, Sept. 15, 1998 parole hearing transcript, pp. 7-8.  This summary,
19  with very minor modifications, is identical to the summary of the offense as set forth in the 1982 Probation Officer's Report.  Petitioner's Ex. CC, Doc. # 4-3, p. 14; Answer, Doc. # 29-1, Ex. 2,
20  p. 6.

21      [14] At the 2003 hearing, the presiding commissioner stated to petitioner:  "You're not required to discuss your offense, nor are you required to admit to your offense.  However, this
22  Panel does accept as true the findings of the court meaning that we won't retry the case, Mr. Brodheim, we will accept the facts as they've been given to us here today."  Answer, Ex. 8, p. 28.

23      [15] At the October, 1995, initial parole consideration hearing, the presiding commissioner read the incident offense identified as taken from the July 1994 BPH report (rather than
24  September 1994).  See Answer, Doc. # 29-2, Ex. # 3, Oct. 26, 1995 initial parole consideration hearing, pp. 9-10 (court pagination).

26      [16] See Answer, Doc. # 29-4, Ex. # 4, September 15, 1998, second (or subsequent) parole consideration hearing (court pagination), p. 9.

17

And in essence this is the murder of Christian Malmquist, she was 24. And the prisoner used a ruse to lure the victim as she was his former girlfriend to allow him to see her, he claimed that his mother had recently died. Once you got into - - got together with the victim, you beat the victim over the head with a bottle and then you strangled her the victim. Then you proceeded to have sexual intercourse with the corpse of the victim and then you attempted to use lighter fluid to set her body on fire, unsuccessfully. And then after all of that, then you attempted to commit suicide by jumping off an overpass. And then the prisoner's version would be that, the prisoner indicated that - - from the probation report is essentially correct. However, he denied the act of necrophilia described therein. He has accepted responsibility for his crime at the earlier stage and has never denied culpability. In addition, the prisoner stated that he had attempted to set both his and the victim's bodies on fire in an unsuccessful suicide attempt and wishes to make this point of clarification.

Answer, Ex. 8, pp. 31-32.

Petitioner's parole hearing counsel stated:

In regards to the commitment offense, under the offense summary, it says the act of sexual deviancy was alleged but unproven in court. I believe that there were alleged statements made to the District Attorney while my client was hospitalized and not exactly in a lucid state. The bottom line is that they were unproven in court.

Answer, Ex. 8, pp. 32-33.[17]

It was noted by the panel's presiding commissioner that as to pre-conviction factors, petitioner had no juvenile arrest record, nor any adult arrest or conviction record "until the instant offense." Answer, Ex. 8, p. 32. Post-conviction factors included one CDC 115 on September 4, 1997 for disrespect towards staff, resulting in a three-day loss of credits, with no CDC 128's noted. Id., at 34.

---

[17] At the 1995 initial parole consideration hearing, petitioner stated that he tried to set a quilt on fire in order to place it on himself and the victim to set "the whole place on fire," attempting to clarify that "[i]t was a quilt that I attempted to burn." Answer, Ex. # 3, p. 10. He made a point of his having "no recollection" that any act of sexual intercourse with the victim after her death had occurred, but did "remember clearly strangling Kristin very viciously." Id., at 10-11. When asked if he had beaten her with a bottle, he responded that he had "hit her over the head with the bottle which knocked her unconscious," and acknowledged "[a]t that point I wanted to kill Kristin." Id., at 11.

1    With regard to self-help, what I have is combined with laudatory
2    chronos.  I have a January 9th, 2002 chrono from Chaplain Keith
     Knauf that indicate participation in Victim's Offender Learning
3    Together, or VOLT, program and Christian Temperament
     completion certificate dated October 2002 and the period covered
4    from January through October of 2002.  Then there's a chrono
     January 3rd, '99 from M. Rodesillas, [...], supervisor academic
5    instruction as far as basic and advanced training for trainer 32-hour
     workshop on Alternatives to Violence, and that was January 1st,
6    2nd, and 3rd of '99.  And Lewis Wright, [...], April 28th, '99 as
     correctional counselor and sponsor, "Thoughtful, reflective, listens
7    carefully to others and relationships with significant others, anger
     and stress control."  And that is as far as your participation in the
8    self-help or therapy group.  Self-Esteem Enhancement certificate,
     April 9th of '99, J. Duke and B. [...] Dupre.[18]

9    ---------------------------------------------------------------------------

10   And laudatory chrono from Dave Martin, facilitator, [...], San
     Quentin's Attitudinal Healing Group or HAHG and the principles
11   of the group is [sic] learning, forgiving, achieving experience of
     inner peace rather than conflict.  And that was April '99 and also in
12   July '99 from Mr. Martin.  In Advanced Alternatives to Violence
     workshop you were co-facilitator and that's from April through
13   May of '99 and that's M. Rodesillas, [...], supervisor, [...],
     instructor, San Quentin, and that's dated May 2nd, '99.  And also
14   September 5th, '99 Alternatives - - a similar chrono from M.
     Rodesillas.  Now it looks like you've applied to pastoral care
15   services and your application was accepted by Chaplain Keith
     Knauf, [...]....

16

17   Answer, Ex. 8, pp. 34-35.

18    [I]t's noted in the memorandum they accepted your application
     and they're waiting for a vacancy.  Okay, laudatory chrono from K.
19   Martin, correctional officer, and officer Martin has been with the
     department for 30 years and known you off and on for
20   approximately 10 while you were housed at CMF.  "And during
     that time never known Brodheim to be less than professional and
21   polite in his dealings with others."  J. Highly [] correctional officer,
     October 29th, '01,  And with regard to your - - he works in the law
22   library and indicated you're hardworking and cooperative and
     courteous and helpful to both staff and inmates.  And similar
23   chrono from A. Avala [] May 6th of '02.  And ... J.T. Arnold [],
     substitute librarian, January 7th, '99.  "Most valuable - - most able
24   to deal with difficult belligerent patrons, most respectful and
     empathetic towards everyone."

25   _____

26   [18] R. Dupre was identified as a psychiatrist.  Answer, Ex. 8, p. 35.

Id., at 36-37.

Also noted was petitioner's participation in academic and literacy programs in 2000, in which petitioner was a tutor, and his helping developmentally disabled inmates with legal research in 2001.  Id., at 37-38.  Also in the record was petitioner's satisfactory completion of a 1999 San Quentin education college program in 1999, and tutor workshop certificates in 1999, voluntary work and tutoring inmates for a GED; participation in a 1999 San Quentin college program and in a Holocaust Forgiveness and Reconciliation seminar, for which the professor  commended petitioner's participation.  Id., at 38.  Petitioner also received a laudatory chrono in 1999 from S. McPhetridge, post-secondary education section coordinator.  Id., at 38-39.  The Sixth District Assembly member, Carrie Mazoni, commended petitioner's work as a Bay View Adult School teacher's aide:

> As your assembly member, I'm proud of your commitment and
> dedication to making Bay View Adult School the best that it can
> be.  You are instrumental in program organization,[] coordination
> and providing moral support to [] graduates.

Id., at 39.

The deputy commissioner noted petitioner's being recognized for "outstanding work performance."  Id.

The BPH panel member then read from the June 18, 2002, Board report by B. Belancik, a correctional counselor at California Medical Facility.  Answer, Ex. 8, p. 39. As to post-conviction factors, it was noted in that report that petitioner had appeared before BPH on his subsequent parole suitability hearing on September 15, 1998, at which time parole was denied for four years with the recommendation that petitioner "become disciplinary-free, work towards, reducing custody, and participating in self-help therapy."  Id., at 39-40.  The report noted that petitioner had continued to comply with the recommendation, remaining disciplinary-free since September 4th of 1997.  Id., at 40.  The report noted further that petitioner had programmed at San Quentin, Folsom and CMF, and although he had been endorsed to the

1    CCCMS level in March of 2000, was not taking psychotropic medications at this time.  Id.  The

2    report noted petitioner's work assignments as law library clerk, teacher's aid, yard crew,

3    observing that petitioner had received exceptional ratings with multiple laudatory chronos in

4    August of 1998, and in January and August of 1999, and in October of 2001 and May of 2002 as

5    well as others.  Id., at 41.  Also put on the record were laudatory chronos regarding petitioner's

6    involvement in Advanced Alternatives to Violence, Man Alive, Stop Physical Violence,

7    Parenting program, self-help group, GED tutoring, [] University Literacy program, Teacher's

8    Aid, EOLT, African Restored to Justice, KAIROS, Jewish Community.  Id., at 41-42.

9               Aggravating factors all centered on the conviction offense:

10              Crime involved ultimate and great bodily harm victim's death,
                prisoner was armed with a user weapon, bottle, during the
11              commission of the crime.  Victim was vulnerable, prisoner took
                advantage of position of trust to gain access to commit the offense.
12              [Inaudible] of the crime indicates premeditation.

13              Mitigating factors, no prior criminal record, prisoner may have
                been suffering from mental condition that may have reduced his
14              culpability for the crime.[19]

15    Answer, Ex. 8, p. 42.

16              In the summary, the report stated that based on the seriousness of the crime

17    and "related issues," "this writer believes prisoner would pose an unpredictable degree of threat

18    to the community" if released at this time and suggested that before release "he could benefit

19    from maintaining the present program gains along with participation in self-help."  Id., at 42-43.

20    The Correctional Counselor Belancik's report as read by the commissioner concludes:

21              Based on Brodheim's educational background, the writer does not
                believe that educational upgrading is necessary.  Report is based on

22

23              [19] In opposing petitioner's parole, Deputy District Attorney (DDA) Backers stated that her
      "main concern" was a "recurring misrepresentation" of the facts with regard to the statement
24    involving the mitigating factor of petitioner potentially having been suffering from a mental
      condition that reduced his culpability.  Answer, Ex. 8, pp. 55-56.  The DDA stated that the then-
25    existing defense of diminished capacity had been invoked at the trial but that this "defense was
      summarily rejected by the jury which was evidenced by a finding of premeditation and first-
26    degree murder."  Id.

1        approximately one-hour interview and complete review of Central
2        File, approximately eight hours.

3    At this point, petitioner's counsel for the hearing asserted that petitioner had agreed with the

4    contents of the addendum Board report with the understanding that per his conversation with CC

5    Belancik that "unpredictable" meant "I don't know."[20]   Answer, Ex. 8, p. 43.  His counsel also

6    pointed out that with respect to the great bodily harm aspect of the aggravating factors that

7    petitioner had been acquitted of the GBI charge.  Id., at 43-44.  Of course, it appears that what

8    Belancik was referring to was the death of the victim, which is indisputably the most critically

9    severe form of bodily harm, although there is no evidence that petitioner has ever denied his

10   responsibility for that murder before the BPH.  Petitioner's hearing counsel went on to point out

11   that while incarcerated petitioner had gone on to earn a Master's degree, having, prior to his

12   commission of the crime and imprisonment, earned a Bachelor of Science in Physics.[21]

13         Sections of the psychological evaluation authored by a clinical psychologist,

14   Raymond C. Crawford, dated July 1, 2002, are next quoted by a deputy commissioner.  Answer,

15   Ex. 8, pp. 45-49.[22]  From "Section 12, current mental status treatment needs"

16        Interview of inmate, alert[,] animated, and responsive.  His goal
17        oriented focus shows great talent, organizing procedures, appears

18      [20] As to the unpredictable risk assessment by Belancik, petitioner includes an exhibit of
Belancik's responses to interrogatories served on him by plaintiff (evidently a defendant in
19   Brodheim v. Cry, CIV-S-02-0573 EJG PAN P) wherein Belancik concedes that he had informed
plaintiff (petitioner herein) that his use of the term "unpredictable" in the 2002 report meant that
20   he did not know how to predict petitioner's future behavior and was not intended to characterize
petitioner's behavior or character as unpredictable.  Petitioner's Ex. 11-D, Doc. # 4-1, pp. 112-
21   114.

22      [21] Numerous exhibits produced by petitioner attest to his past academic prowess,
including a document indicating he had attained his Bachelor of Science degree in Physics from
23   the Massachusetts Institute of Technology (MIT) in June of 1980, and letters of acceptance, also
dated in1980, to the Ph.D. Physics programs at Harvard, Princeton, Stanford, MIT, UCLA and
24   UC Berkeley; in these letters admitting petitioner, he was to be awarded at least one prize and
offers were made of various fellowships, grants and teaching assistantships.  Petitioner Ex. CC,
25   Doc. # 4-3, pp. 20, 31-44.

26      [22] Petitioner includes a copy of the evaluation as Ex. RR, Doc. # 4-6, pp. 19-27.

to have made significant gains in his ability to introspect.  He has improved interpersonal relationship skills over the years with the help received from both group and individual therapies, maintains self-assured manner.  Inmate is currently assigned to the law library where his work is highly rated.  He continues to be monitored CCCMS program where he is now deemed as stable, motivated, and fully recovered from his recent depression.  He is not receiving any psychotropic medication at this time, maintains active correspondence with family members and academicians in the community, regular correspondence with family members who are all very support [sic], his current adjustment appears optimal.

Id., at 45-46.

Petitioner's "Axis I Depressive Disorder" is noted as "in remission"; his "Axis II Excessive[sic]-Compulsive personality disorder,[23] with narcissistic and borderline features" is deemed "greatly improved."  Id., at 46.  His GAF is noted to be 93.  Id.  Under "assessment of dangerousness, section 14," the panel includes the following from the psychological evaluation:

Anger as a result of feelings of rejection is a large factor in [t]he current offense.  Also appears that in family constellation, violence was a mode of communication.  Being male increases the risk of violence.  However, the inmate is now at age where the incidence of violence is markedly reduced.  The inmate does not show biological correlation relating to violence.  The inmate has matured and demonstrated good judgment of [sic] self-control,[24] learned to handle difficult situations, continues to maintain his composure.  His violence risk is considered to be very low at this time.

Id.

The panel quotes from the clinician's observations/comments/recommendations:

If the inmate should be released to the community, his violence potential has significantly decreased and is considered low.  He does not require psychotropic medication, considered to be quite amenable to parole supervision if released to the community and would not pose a danger to the community.

Id., at 47.

---

[23]  The hearing transcript misquotes the report which actually identifies the condition as "Obsessive-compulsive personality disorder."

[24]  The panel transcript erroneously states the report which actually says "good judgment and self control."

The BPH panel then recounts petitioner's parole plans which include residing with an attorney named Michael Lasher, plans to further his education in physics and to resume employment in that field, an immediate employment offer from a Darlene Oates; alternatively, petitioner asked BPH to consider granting him parole to Georgia to live with his father or to Connecticut to live with his sister. Id. at 47-48.  Also noted are numerous letters of support, including one from a Professor Rappaport, his former advisor at MIT.  Id., at 48-50.  Mr. Lasher offered residency in his home for which petitioner could do household tasks in lieu of rent; his father and siblings offered their residences for him as well.  Id.  at 49.  A "very supportive letter" was submitted by petitioner's Match Two sponsor, a retired Air Force lieutenant colonel.  Id., at 49-50.  Professor Rappaport is reported to have sought petitioner's assistance in the study of black holes and petitioner states that he has already begun that study and exchanged ideas with Dr. Rappaport. Id. at 52.  Nothing indicates that petitioner's plans for the future were in any way unrealistic.  See Cal. Code Regs. tit. 15, § 2402(d)(8) (realistic plans or development of marketable skills tends to show suitability for release).

The Deputy District Attorney asserted that the murder involved planning for over a week, detailing petitioner's use of a false claim that his mother had had a heart attack and when that did not work for the victim to agree to see him, later escalated his lie to saying his mother had died.  Answer, Ex. 8, pp. 56-57.  The DDA spoke of petitioner's having purchased a .38 caliber snub-nosed revolver but, disappointed because of the 15-day waiting period required before he could take possession, then having gone to a different store to buy a folding buck knife which petitioner took with him to the scene of the murder [although he evidently did not use it to kill the victim].  Id., 57.  The victim, Christian Malmquist, evidently was concerned about petitioner's wish not to attend his mother's funeral and she agreed to see him to talk about it.  Id., at 57-58.  When he went to see the victim, petitioner had the buck-knife, razor blades, a bottle of champagne and a can of lighter fluid.  Id., at 58.  The scene of crushing her skull from behind "with a blow from the champagne bottle" is described as well as his then having strangled her

with his bare hands.  Id., at 58-59.  The DDA then recounted that petitioner's anger was such that

he then raped her dead body twice, which she says petitioner admitted six days after killing

Christian.  Id., at 59.  Burns to the victim's hip area were the result of petitioner's having poured

lighter fluid there and set it on fire.  According to the DDA, in a conversation with a psychologist

six days after the crime, petitioner said that he had no remorse and would do it again.  Id.  The

DDA stated that a witness, Ms. Marvic, testified at trial that while he was attending MIT, she had

dated petitioner, who ultimately harassed her to the point that she dropped out of Wellesley and

went into hiding from him; this incident was alleged to have occurred one and a half years before

Christian's murder.  Id., at 60.  The DDA referred to seven diagnoses of petitioner showing some

kind of personality disorder involving obsessive-compulsive personality disorder with

narcissistic tendencies and argues that evaluations that describe him as being at a low risk of

danger to society are "completely invalid" because petitioner has continued to lie about what he

did during the murder and because he blames the victim.  Id., at 60-61.

Petitioner's parole hearing counsel, in response,  noted that the mitigating factors

were noted in the Probation Officer's report and argues that petitioner's actions before, during

and subsequent to the murder were not those of someone thinking clearly.  Answer, Ex. 8, p. 62.

Petitioner's counsel referred to the statements made by petitioner brought up by the DDA with

respect to questioning by another district attorney while petitioner was in an acute facility and

that some other person who went to see him stated that he appeared to be drugged and making no

sense.  Id., at 62-63.  Petitioner's hearing counsel countered, too, that the act of sexual deviancy

was not proved in court and that the alleged previous incident of stalking another former

girlfriend never resulted in a charge or conviction.  Id., at 63.  Petitioner's hearing counsel also

averred that petitioner had admitted the majority of what the DDA had said and that although he

was not speaking to the offense at the 2003 hearing, he had accepted responsibility for taking the

victim's life and that rather than blame the victim that he had realized he was reacting and not

wanting the relationship to end.  Id., at 64.  Counsel for petitioner asked how the panel could

1   determine that petitioner posed a current risk, pointing out his lack of any assaultive or violent

2   behavior or involvement with substance abuse while in prison, as well as repeating his

3   participation in self-help and therapy programs, asserting that he had probably gone as far as he

4   could academically in prison, that his psychological evaluations supported suitability, that his

5   parole plans would lead to a smooth transition, that his family would provide assistance, that he

6   had complied with the BPH recommendations and that he had taken full advantage of what the

7   CDC[R] had to offer.  Id., at 65-70.   His counsel read petitioner's closing statement wherein he

8   acknowledged that he had without justification taken the life of an innocent woman, wrote of his

9   sorrow for what he had done, of accepting responsibility for the pain he had inflicted, of having

10   learned that he, and no other, is responsible for his feelings, and of having committed himself to

11   non-violence, of having generally grown through hard work and matured for the half of his life

12   he had spent incarcerated and of never having reacted with physical violence in an environment

13   where that is a frequent response.  Id., at 70-74.

14           In finding petitioner unsuitable to parole and that he "would pose an unreasonable

15   risk of danger to society or a threat to public safety if released at this time," the presiding

16   commissioner of the panel identified "the paramount" reason to "be the timing and the gravity of

17   [t]he committing offense."  Answer, Ex. 8, p. 76.  The offense is described as having been

18   "carried out in an especially cruel and vicious manner" as well as "in a dispassionate and

19   calculated manner."  Id.  The circumstances of the murder of the 24-year-old victim (by the then

20   22-year-old petitioner) are again detailed, beginning with petitioner's having used the

21   "ruse" of his mother's death (which had not occurred) to get her to allow him to meet with her,

22   going on to hitting the victim on the head with the bottle and then strangling her.   Id., at 76-77.

23   It is pointed out that petitioner denied having sexual intercourse with the victim but the panel

24   recounts the act as part of the record.  Id.. at 77.  The unsuccessful attempt to mutilate her body

25   by use of lighter fluid is noted.  Id.  The motive for the crime is described as "trivial and

26   inexplicable" inasmuch as it was about rejection and control.  Id.   The transcript goes on:

Previous record, the prisoner had a history of unstable tumultuous relationships with others, experimenting with drugs, had a previous problem with rejection in terms of stalking another - - or a former girlfriend.  There was no conviction on that particular event, nevertheless it still transpired.  Institutional behavior, the prisoner has performed well, he's done a yeoman's job.  However, he's not sufficiently participated in beneficial self-help and therapy at this time.  There are not 115s, he only has one 115 in 1997, no 128s.  Psychosocial report was adequate, parole plans are adequate, alternate places.  3042 Notices, the Hearing Panel notes opposition, specifically the District Attorney's Office of Alameda County is present today in opposition, as well as the victim's next-of-kin is present today in opposition, as well as numerous letters received in opposition.  Other information bearing on suitability would be that the prisoner's counselor, CC-I  B. Belancik, wrote that the prisoner would pose an unpredictable degree [sic] if released to the public at this time.  Remarks, the Panel makes the following findings: That the prisoner still needs some self-help therapy in order to face, discuss, understand, and cope with stress in a nondestructive manner to better understand the causative factors that caused you to take the life of this young woman, young promising woman.  Both of you had all your lives before you yet you chose to cancel that life and attempted to cancel your own life.  However, the prisoner has made some positive gains and must continue to demonstrate the ability to maintain these positive gains over an extended period of time.

Answer, Ex. 8, pp. 77-79.

The commissioner goes on to observe that it was commendable that petitioner had had only one CDC-115 (although he notes it was in 1997), and no CDC-128's in his entire incarceration period,[25] that petitioner had participated in a number of self-help programs, in

Conflict Resolution, Victim's Offenders Learning Together, VOLT, African Restoration - - Restored to Justice, he's been a teacher's aid, a tutor, he's participated in Alternatives to Violence, Man Alive, Katargeo, KAIROS, upgraded himself educationally.  He's been a peer academic instructor, a literacy tutor tutoring GED preparation.

Id. at 79.  In addition, the panel noted that his law library work reports were also positive.  Id.

Nevertheless, these positive behavioral factors were not found to outweigh his unsuitability

---

[25] The rule violation report had occurred before his second parole suitability hearing with no violation having occurred from that point and the third hearing, at issue herein.

factors and the panel found it not reasonable to expect that petitioner in view of the murder

conviction would be granted parole within the next three years.  Id.

> The specific reasons for our findings are as follows: That the prisoner committed the offense in an especially vicious and brutal manner wherein the prisoner caused the demise of Christian Malmquist being a 24-year-old young woman, a former girlfriend of the prisoner, who was trying to break it off with the prisoner, and the prisoner refused to accept that the relationship was over. Wherein the prisoner used a ruse to lure the former girlfriend, Christian Malmquist, to allow him to see her claiming that your mom had recently died.  And once you got together, you beat the victim with a bottle over the head, then you strangled the victim to death.  The offense was carried out in a dispassionate and calculated manner in that there was evidence as well that you tried to purchase a weapon, finding out that there was a waiting period after you purchased the weapon.  The victim's body was defiled and mutilated in that during - - or after the murder itself, you proceeded to have sexual intercourse with the corpse of the victim, and then attempted to burn the victim's body with lighter fluid in an unsuccessful attempt.  The offense was carried out in a manner which demonstrates exceptionally insensitive disregard for human sufferings, as I said that this was supposedly someone that you cared about.  The motive for this crime was inexplicable or very trivial in relationship to the offense, Mr. Brodheim, this is about control, rejection, and acceptance.  The prisoner had a history of unstable tumultuous relationships with others, experimenting with drugs, alcohol usage [], having a prior stalking event with another girlfriend.  Therefore a longer period of observation or evaluation of the prisoner is called for before the Board should find that Mr. Brodheim is suitable for parole.

Answer, Ex.8, pp. 79-81.

> Recommendations are to continue to remain disciplinary free, that doesn't appear to be a problem for you, Mr. Brodheim, you've been disciplinary free except for the one hiccup that was reduced. As well, if it's available to you, to continue to upgrade educationally.  I understand that you wanted to do some more research in terms of the black hole.  If it's available for you to do so, then you should try to get it done.  As well as, if it's available to you, to participate in beneficial self-help and therapy programming, whatever may be available, as I mentioned earlier, to better understand the causative factors, what caused you to be involved, what caused [sic] to commit this atrocity that took the life of another young human being that still had her life before her as you had an exceptional life before you as well.

Id., at 81.

1      The presiding commissioner also stated that he believed that petitioner needed to

2   understand his actions more, rather than to defend them.  Id., at 83.  It is unclear how it is that

3   petitioner can be said to be defending himself when he has not contested his responsibility for the

4   crime.[26]

5      Although the moving comments of Christian Ann Malmquist's older sister, Lynn

6   Trivett, describing the exceptional characteristics of the young woman whom petitioner so

7   senselessly murdered underscores the perception of how incalculable her loss is, to the victim

8   herself, her devoted family and friends as well as society as a whole, and attest to how much

9   undiminished pain petitioner has inflicted upon Christian's family and friends (Answer, Ex. 8,

10  pp. 5, 74-75), Ms. Trivett's statement simply does not speak to the issue most germane to the

11  question of parole suitability and does not constitute "some evidence" to support a finding that

12  petitioner's release posed at that point a risk of danger to the public.  Nor do the letters

13  referenced as submitted in opposition to parole, the details of which are not specifically

14  characterized other than to say they outlined the crime and encouraged denial of a parole date,

15  and of which there were apparently quite a few, at least 268, appear to have been particularly

16  relevant to the question of current dangerousness; further, they were apparently for the most part

17  form letters and evidently were, according to petitioner's hearing counsel, other than those from

18  the victim's family members, written by people unknown to petitioner.  Answer, Ex. 8, pp.  14-

19  15, 53, 83.

20     The state supreme court's denial cited to the following: In re Rosenkrantz, 29

21  Cal.4th 616 (2002); In re Dannenberg, 34 Cal. 4th 1061 (2005); People v. Duvall, 9 Cal.4th 464,

22  474 (1995).  AP, p. 91; Answer, Ex. 30-2.  In Duvall, the California Supreme Court made clear

23  that it was petitioner's burden in a habeas petition to establish the grounds for his release, i.e., to

24

25  [26] Perhaps the panel saw petitioner's denial of having engaged in sexual intercourse with the body of his victim post-mortem or his having indicated that he only hit the victim with the bottle once, rather than having beaten her with it as not accepting full responsibility for his crime,

26  but petitioner has not denied committing the murder for which he was convicted and sentenced.

make a prima facie showing of entitlement to release.  9 Cal.4th at 474.  Thus, this denial makes a ruling on the merits of petitioner's claim, evidently finding them inadequate.  Therefore, although respondent (Answer, p. 8) contends that the California Supreme Court's ruling is a summary denial through which the court should look to the last reasoned decision, Ylst v. Nunnemaker, 501 U.S. 797, 803-04, 111 S. Ct. 2590 (1991); Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000), the court will not look through to the reasoning of the Alameda County Superior Court denial decision,[27] but will instead look to the ruling on the merits made by the highest state court.[28]

In Rosenkrantz, as noted earlier, the California Supreme Court found the nature of the prisoner's offense alone could constitute a sufficient basis to deny parole.  29 Cal. 4th at 682. Citing Rosenkrantz, the Dannenberg Court found that  "some evidence" can be satisfied by a finding that the commitment offense was "'especially callous and cruel,' showed 'an exceptionally callous disregard for human suffering,' and was disproportionate to the 'trivial' provocation."  In re Dannenberg, 34 Cal. 4th at 1095, 23 Cal. Rptr.3rd 417, 440-41.  Thus, "the Board could use the murder committed by Dannenberg as a basis to find him unsuitable, for reasons of public safety, to receive a firm parole release date."  Id.

The California Supreme Court in In re Lawrence subsequently clarified (noted above) the implication that could arise from these earlier decisions:

> [W]ith regard to the aggravated circumstances of a commitment offense, we conclude that to the extent our decisions in *Rosenkrantz* and *Dannenberg* have been read to imply that a particularly egregious commitment offense always will provide the

---

[27] See petitioner's Ex. 13-A, Doc. # 4-2, p. 4; Answer, Ex. 29-10, pp. 2, 18.   Oddly, the state Fifth Appellate Court, in denying the petition without prejudice, found that petitioner had failed to exhaust the administrative appeal process, even though in its denial the superior court had reached the merits.  Petitioner's Ex. 13-B, Doc. # 4-2, p. 6.

[28] The issue of which court's decision to look at is not important to the resolution of this case.  The Superior Court's rationale was based only on Rosenkrantz, which was substantially modified by Lawrence.  See text infra. The Supreme Court decision in this case was also pre-Lawrence.

1
2
3
4

> requisite modicum of evidence supporting the Board's or the
> Governor's decision, this assumption is inconsistent with the
> statutory mandate that the Board and the Governor consider all
> relevant statutory factors when evaluating an inmate's suitability
> for parole, and inconsistent with the inmate's due process liberty
> interest in parole that we recognized in *Rosenkrantz*.

5   <u>Lawrence</u>, 44 Cal.4th at 1191, 82 Cal. Rptr.3d 169.

6   Thus, "the relevant inquiry is whether some evidence supports the decision of the

7   Board or the Governor that the inmate constitutes a current threat to public safety, and not merely

8   whether some evidence confirms the existence of certain factual findings." <u>Id</u>., at 1212, 82 Cal.

9   Rptr.3d 169. "[C]urrent dangerousness is the fundamental and overriding question for the

10   Board...." <u>Id</u>., at 1213.

11
12
13
14
15

> [T]he relevant inquiry is whether the circumstances of the
> commitment offense, when considered in light of other facts in the
> record, are such that they continue to be predictive of current
> dangerousness many years after commission of the offense.  This
> inquiry is, by necessity and by statutory mandate, an individualized
> one, and cannot be undertaken simply by examining the
> circumstances of the crime in isolation, without consideration of
> the passage of time or the attendant changes in the inmate's
> psychological or mental attitude.

16   <u>Id</u>., at 1221.

17   Petitioner has pointed to psychological reports that assess him as not posing a risk

18   to public safety.  Corrected Notice of Supp. Authority, Doc. # 38, p. 5, citing AP, pp. 4-5, 11-12.

19   The court observes that the record of the hearing, as set forth above, substantiates this as well as

20   demonstrating that he had never been disciplined for engaging in any form of physical violence

21   throughout the more than twenty years of his incarceration prior to the 2003 BPH panel hearing.

22   Petitioner's counsel points out that petitioner has a confirmed job offer from an attorney named

23   Michael Lasher.  Id., citing AP, p. 10.[29]  Petitioner contends that respondent in the answer fails to

24   address any of his contentions alleging the findings of the BPH were not supported by some

25
26   [29] Petitioner's citations to the amended petition correspond to the page numbering within
that document as opposed to the court's electronic pagination.

31

reliable evidence or were refuted by relevant evidence or were otherwise arbitrary, rather simply

repeating that the BPH "cited multiple factors" in the 2003 parole denial.  Id., at 6, citing

Answer, p. 12.

More important to the undersigned in assessing whether the California Supreme

Court's decision rests on "some evidence" of current dangerousness is the fact that continuous

reliance on unchanging circumstances transforms an offense for which California law allows

eligibility for parole into a de facto life imprisonment without the possibility of parole.  The court

asks rhetorically – what is it about the circumstances of petitioner's crime or motivation that is

ever going to change?[30]  The answer is nothing.  The circumstances of the crime will always be

what they were, and petitioner's motive for committing murder will always be trivial.[31]

Petitioner has no hope of ever obtaining parole except perhaps that a panel in the future will

arbitrarily hold that the circumstances were not that serious or the motive was more than trivial.

Given that *no one* seriously contends lack of seriousness or lack of triviality at the present time,

the potential for parole in this case is remote to the point of non-existence.  Petitioner's liberty

interest (as recognized in state courts) should not be determined by such an arbitrary, remote

possibility.[32]

---

[30] Unchangeability applies as well to any "stalking" incident involving another individual apparently having occurred some years prior to the murder (for which, as petitioner's counsel avers (Answer, Ex. 8, p. 63), petitioner was neither prosecuted nor even charged).

[31] The "rejected lover" motivation for murder is all too common, and as ancient as the human race, but commonality and longevity do not make less trivial the motivation to murder an independent human being simply because that being does not desire to associate with the rejected person.

[32] To a point, it is true the circumstances of the crime and motivation for it may indicate a petitioner's instability, cruelty, impulsiveness, violent tendencies and the like.  However, after some twenty-one years at the point of the denial at issue (and around twenty-eight years at this point) in the cauldron of prison life, not exactly an ideal therapeutic environment to say the least, and after repeated demonstrations that despite the recognized hardships of prison, this petitioner does not possess those attributes, the predictive value of the circumstances of the crime approaches zero.  It is only when relatively recent misconduct or exhibitions of mental disease, and the like, have been exhibited does the similar circumstances of the crime point to assist in arriving at the conclusion of a *future* danger if released.

1    In the instant case, the BPH has undeniably relied on these unchanging factors at

2    least two prior times in finding petitioner unsuitable for parole (and apparently has at least one

3    additional time subsequent to the 2003 parole suitability denial – footnote 4 above),

4    notwithstanding that petitioner has "continu[ed] to demonstrate exemplary behavior and evidence

5    of rehabilitation." Biggs v. Terhune, 334 F.3d at 916.  Under these circumstances, the continued

6    reliance on these factors, without any connection to factors demonstrating current problems, fails

7    to meet the Hayward "some evidence" test with respect to future dangerousness.

8    Finally, the recommendation that petitioner participate in self-help and therapy

9    programs so that he can better understand what caused him to take the life of a promising human

10    being does not appear to be supported by medical or other evidence.  The extensive number of

11    such programs in which petitioner had participated was set forth in detail and the conclusion that

12    petitioner needed more such programming appears to be simply one repeated often in order to

13    add another factor to the non-suitability conclusion.  Clearly, a conclusion by lay BPH

14    commissioners that petitioner had not yet achieved required therapy for insight or other reasons is

15    not reasonably sustainable, certainly not to the degree it relies on a correctional counselor's

16    evaluation of petitioner posing an unpredictable degree of risk where the counselor has conceded

17    that assessment is simply meant to indicate his own inability to make any such prediction and not

18    that the petitioner's behavior itself is unpredictable.  A state court's conclusion to the contrary is

19    patently unreasonable.

20    Because the court has found the writ should be granted as to several grounds, the

21    court need not address those grounds for which petitioner apparently now believes an evidentiary

22    hearing is necessary (although initially it did appear that petitioner's counsel had expressly

23    conceded there was no necessity for any evidentiary hearing[33]).  The Ninth Circuit has found that

24

25    [33] See Traverse, Doc. # 32, p. 5, but see petitioner's Supplemental Briefing, Doc. # 50, fn.

26    1.

33

1  all claims of a habeas petition need not be addressed or adjudicated if the claim or issue decided

2  is dispositive of the action.  See Blazak v. Ricketts, 971 F.2d 1408 (9th Cir. 1992)(per curiam).

3  Conclusion

4          As the undersigned has stated on occasion in previous cases: the Legislature

5  would have certainly been within constitutional boundaries to make murders such as this, or all

6  murders for that matter, subject to a punishment of life without the possibility of parole.

7  However, the California Legislature has chosen not to do so, has instituted a policy of focusing

8  on future danger with respect to eligibility for parole, and nowhere has permitted those tasked

9  with carrying out the legislative mandate to veto it via a repeated, latter day personal opinion

10  (which may even be shared by the undersigned) that the murder in question deserved a harsher,

11  "paroleless" penalty.

12          Accordingly, IT IS ORDERED THAT the Clerk of the Court substitute the name

13  of Kathleen Dickinson in place of M. Veal as respondent in the docket of this case.

14          IT IS HEREBY RECOMMENDED that petitioner's writ be granted on the ground

15  that BPH's continued reliance on immutable factors does not constitute "some evidence" of

16  current or future dangerousness.

17          Assuming the commission of no subsequent serious disciplinary infractions,

18  particularly any of a violent nature, BPH should be ordered to calculate petitioner's release date

19  in accordance with the applicable matrix, and if such date would have already occurred,

20  petitioner should be released on parole.

21          These findings and recommendations are submitted to the United States District

22  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

23  days after being served with these findings and recommendations, any party may file written

24  objections with the court and serve a copy on all parties.  Such a document should be captioned

25  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

26  shall be served and filed within fourteen days after service of the objections.  The parties are

1   advised that failure to file objections within the specified time may waive the right to appeal the

2   District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3   DATED: 09/20/10

/s/ Gregory G. Hollows

_____
UNITED STATES MAGISTRATE JUDGE

7   GGH:009
    brod2326.fr